**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL GUTTENTAG and STEVEN REEVES, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>RUBY TUESDAY, INC., DOE DEFENDANTS 1-10,<br><br>        Defendants. | Civil Action No. 12-cv-03041 (AT) |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO APPROVE SETTLEMENT, AWARD ATTORNEYS' FEES AND EXPENSES, AND GRANT SERVICE AWARDS**

**FARUQI & FARUQI, LLP**
Lubna Faruqi (LF-8409)
Adam R. Gonnelli (AG-4782)
369 Lexington Avenue, 10th Floor
New York, NY 10017
Telephone: (212) 983-9330
Facsimile: (212) 983-9331

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................. 1

II.   THE LITIGATION ............................................................................. 1

      A.    THE PLEADINGS................................................................... 1

      B.    DISCOVERY ......................................................................... 2

      C.    COLLECTIVE CERTIFICATION........................................... 3

      D.    NOTICE .................................................................................. 7

            1.    THE INITIAL NOTICE ............................................... 7

            2.    THE REMINDER NOTICE ......................................... 8

            3.    THE SUPPLEMENTAL NOTICE FOR UNDELIVERABLE
                  ADDRESSES.............................................................. 8

            4.    REPORTS OF RETALIATORY THREATS........................... 9

      E.    DAMAGE CALCULATIONS ................................................. 10

      F.    THE SETTLEMENT ............................................................... 11

III.  LEGAL ARGUMENT ........................................................................ 14

      A.    THE SETTLEMENT SHOULD BE APPROVED............................. 14

            1.    STANDARDS FOR APPROVAL OF AN FLSA SETTLEMENT ........ 14

            2.    THIS SETTLEMENT ALSO SATISFIES THE RULE 23
                  STANDARD ................................................................ 15

                  a)    PROCEDURAL FAIRNESS ....................................... 16

                  b)    SUBSTANTIVE FAIRNESS ...................................... 16

                        (i)    THE COMPLEXITY, EXPENSE AND LIKELY
                               DURATION OF THE LITIGATION.............................. 16
                        (ii)   THE REACTION OF THE CLASS TO THE
                               SETTLEMENT................................................ 18
                        (iii)  THE STAGE OF DISCOVERY AND THE AMOUNT
                               OF DISCOVERY COMPLETED................................... 19

(iv) AND (v) THE RISKS OF ESTABLISHING LIABILITIES
AND DAMAGES......……………………………..19

(vi)     THE RISKS OF MAINTAINING THE CLASS ACTION
THROUGH TRIAL……………...………………………20

(vii)    THE ABILITY OF THE DEFENDANT TO WITHSTAND
A GREATER JUDGMENT……………………………...21

(viii) AND (ix) THE RANGE OF REASONABLENESS OF THE
THE SETTLEMENT IN LIGHT OF THE BEST
POSSIBLE RECOVERY AND THE RISKS OF
LITIGATION…………………………………………22

B.     THE FEE IS REASONABLE AND SHOULD BE APPROVED....................... 23

1.     THE REQUESTED FEE IS REASONABLE UNDER THE
PERCENTAGE APPROACH ................................................................. 24

a)     THE TIME AND LABOR EXPENDED BY COUNSEL............ 25

b)     THE MAGNITUDE AND COMPLEXITIES OF THE
LITIGATION........................................................................ 26

c)     THE RISK OF THE LITIGATION............................................... 27

d)     QUALITY OF REPRESENTATION........................................... 28

e)     THE FEE IN RELATION TO THE SETTLEMENT.................. 28

f)     PUBLIC POLICY CONSIDERATIONS .................................... 29

2.     THE FEE IS ALSO REASONABLE UNDER A LODESTAR
ANALYSIS........................................................................................ 29

a)     THE REASONABLE HOURLY RATES .................................... 29

b)     THE HOURS EXPENDED ......................................................... 32

c)     ADJUSTMENTS TO THE LODESTAR .................................... 32

(i)     THE TIME AND LABOR REQUIRED........................... 33

(ii)    THE NOVELTY AND DIFFICULTY OF THE
QUESTIONS .................................................................... 33

(iii)   THE LEVEL OF SKILL REQUIRED TO PERFORM
THE LEGAL SERVICE PROPERLY.............................. 34

(iv) THE PRECLUSION OF EMPLOYMENT BY THE ATTORNEY DUE TO ACCEPTANCE OF THE CASE ............................................................................ 34

(v) THE ATTORNEYS' CUSTOMARY HOURLY RATE .............................................................................. 34

(vi) WHETHER THE FEE IS FIXED OR CONTINGENT ... 34

(vii) THE TIME LIMITATIONS IMPOSED BY THE CLIENT OR THE CIRCUMSTANCES .......................... 35

viii) THE AMOUNT INVOLVED IN THE CASE AND THE RESULTS OBTAINED ........................................... 35

(ix) THE EXPERIENCE, REPUTATION AND ABILITY OF THE ATTORNEYS ....................................................... 35

(x) THE UNDESIRABILITY OF THE CASE ...................... 36

(xi) THE NATURE AND LENGTH OF THE PROFESSIONAL RELATIONSHIP WITH THE CLIENTS ......................................................................... 36

(xii) AWARDS IN SIMILAR CASES .................................... 36

C. PLAINTIFFS' COUNSELS' EXPENSES IN THIS CASE SHOULD BE REIMBURSED ................................................................................................. 37

D. THE PROPOSED PLAN OF ALLOCATION SHOULD BE APPROVED ........ 37

E. SERVICE AWARDS ARE APPROPRIATE IN THIS CASE ............................ 38

IV. CONCLUSION ........................................................................................................ 41

# TABLE OF AUTHORITIES

**Cases**                                                                                 **Page(s)**

*In re Alexia Foods, Inc. Litig.*,
    Case No. 4:11-cv-06119 PJH, ECF No. 66 (N.D. Cal. Dec. 12, 2013) ...................................31

*Allapattah Servs. v. Exxon Corp.*,
    454 F. Supp. 2d 1185 (S.D. Fla. 2006) .................................................................................34

*Arbor Hill Concerned Citizens Neighborhood Associations v. County of Albany*,
    522 F.3d 182 (2d Cir. 2007).................................................................................................32

*Asare v. Change Group New York, Inc.*,
    No. 12 Civ. 3371 (CM), 2013 U.S. Dist. LEXIS 165935 (S.D.N.Y. Nov. 18, 2013) ..... *passim*

*Barrentine v. Ark.-Best Freight Sys., Inc.*,
    450 U.S. 728 (1981).............................................................................................................26

*Bazzini v. Club Fit Mgmt., Inc.*,
    No. 1:08-cv-04530-BSJ-MHD (S.D.N.Y. Apr. 21, 2010).....................................................31

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974)...................................................................................... *passim*

*Cox v. Clarus Marketing Group, LLC.*,
    291 F.R.D. 473 (S.D. Cal. 2013) ........................................................................................31

*D.S. v. New York City Dep't of Educ*,
    255 F.R.D. 59 (E.D.N.Y. 2008)...........................................................................................22

*Dunn v. Advanced Credit Recovery, Inc.*,
    No. 11 Civ. 4023 (PAE) (JLC), 2012 U.S. Dist. LEXIS 27205 (S.D.N.Y. Mar. 1, 2012)......32

*In re Elan Sec. Litig.*,
    385 F. Supp. 2d 363 (S.D.N.Y. 2005)..................................................................................27

*Flores v. Anjost Corp.*,
    No. 11 Civ. 1531, 2014 U.S. Dist. LEXIS 11026 (S.D.N.Y. Jan. 29, 2014).................. *passim*

*Frank v. Eastman Kodak Co.*,
    228 F.R.D. 174 (W.D.N.Y. 2005)..................................................................................17, 28

*G.B. v. Tuxedo Union Free Sch. Dist.*,
    894 F. Supp. 2d 412 (S.D.N.Y. 2012)..................................................................................30

*Gay v. Tri-Wire Engineering Solutions, Inc.*,
  No. 12-cv-2231, 2014 U.S. Dist. LEXIS 232 (E.D.N.Y. Jan. 2, 2014) ............................24, 28

*In re Gilat Satellite Networks, Ltd.*,
  No. CV-02-1510 (CPS)(SMG),
  2007 U.S. Dist. LEXIS 68964 (E.D.N.Y. Sept. 18, 2007)........................................................28

*Gilliam v. Addicts Rehab. Cent. Fund*,
  No. 05 Civ. 3452, 2008 U.S. Dist. LEXIS 23016 (S.D.N.Y. Mar. 24, 2008).........................41

*In re Global Crossing Sec. & ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) ............................................................................................34

*Goldberger v. Integrated Res., Inc.*,
  209 F.3d 43 (2d Cir. 2000)..........................................................................................25, 27, 28

*Guadalupe v. Tri-State Emp't*,
  No. 10 CV 3840 (NG) (CLP),
  2013 U.S. Dist. LEXIS 123951 (E.D.N.Y July 31, 2013) ......................................................32

*In re Haier Freezer Consumer Litigation*,
  Case No. C 11-02911 EJD, ECF No. 90 (N.D. Cal. Oct. 25, 2013) .......................................31

*Henry v. Little Mint Inc.*,
  No. 12 Civ. 3996 (CM), 2014 U.S. Dist. LEXIS 72574 (S.D.N.Y. May 23, 2014)........ *passim*

*I.B. v. N.Y. City Dep't of Educ.*,
  336 F.3d 79 (2d Cir. 2003)......................................................................................................29

*Jemine v. Dennis*,
  901 F.Supp. 2d 365 (E.D.N.Y. 2012) ....................................................................................27

*Johnson v. Brennan*,
  No. 10 Civ. 4712 (CM), 2011 U.S. Dist. LEXIS 105775 (S.D.N.Y. Sept. 16, 2011) ..... *passim*

*Johnson v. Georgia Highway Express, Inc.*,
  488 F.2d 714 (5th Cir. 1974) ............................................................................... *passim*

*Kassim v. City of Schenectady*,
  415 F.3d 246 (2d Cir. 2005)........................................................................................28, 35, 37

*Klein ex rel. Ira v. PDG Remediation, Inc.*,
  No. 95 Civ. 4954, 1999 U.S. Dist. LEXIS 650 (S.D.N.Y. Jan. 28, 1999).............................37

*LeBlanc-Sternberg v. Fletcher*,
  143 F.3d 748 (2d Cir. 1998)....................................................................................................37

*Malchman v. Davis*,
    706 F.2d 426 (2d. Cir. 1983)................................................................................16

*Maley v. Del Global Techs. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002)...........................................................18, 25

*Massiah v. Metroplus Health Plan, Inc.*,
    No. 11-cv-05669, 2012 U.S. Dist. LEXIS 166383 (E.D.N.Y. Nov. 20, 2012) ...........14, 15, 24

*Mathis v. Darden Rests.*,
    No. 12-61742-CIV-DIMITROULEAS,
    2014 U.S. Dist. LEXIS 124631 (S.D. Fla. Sept. 1, 2014) ...................................20, 21, 23, 27

*McBean v. City of N.Y.*,
    233 F.R.D. 377 (S.D.N.Y. 2006) ......................................................................25

*McDaniel v. Cnty. of Schenectady*,
    595 F.3d 411 (2d Cir. 2010)..............................................................................24

*McReynolds v. Richard-Cantave*,
    588 F.3d 790 (2d Cir. 2009)..............................................................................16

*Millea v. Metro-North RR. Co.*,
    658 F.3d 154 (2d Cir. 2011)..............................................................................29

*Orme v. Burlington Coat Factory of Or., LLC*,
    2010 U.S. Dist. LEXIS 43258 (D. Or. May 3, 2010) ..........................................36

*In re PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997) ......................................................................20

*Parker v. Jekyll & Hyde Entm't Holdings, LLC*,
    No. 08 Civ. 7670 (BSJ) (JCF), 2010 U.S. Dist. LEXIS 12762 (S.D.N.Y. Feb 9, 2010) .........26

*Perdue v. Kenny A*,
    559 U.S. 542 (2010)..................................................................................28, 33

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*,
    No. 94 Civ. 5587, 2003 U.S. Dist. LEXIS 8239 (S.D.N.Y. May 15, 2003)...........................41

*Rossi v. Proctor & Gamble Co.*,
    No. 11-7238 (JLL), 2013 U.S. Dist. LEXIS 143180 (D.N.J. Oct. 3, 2013) ........................31

*Rozell v. Ross-Hoist*,
    576 F.Supp.2d 527 (S.D.N.Y. 2008)..................................................................30

*Saunders v. City of N.Y.*,
    No. 07 civ 830, 2009 U.S. Dist. LEXIS 115366 (S.D.N.Y. Dec. 9, 2009)...........................33

*Sewell v. Bovis Lend Lease LMB, Inc.*,
    No. 09 Civ. 6548 (RLE), 2012 U.S. Dist. LEXIS 53556......................................................41

*Smith v. Voorhees College*,
    No. 5:05-1911, 2008 U.S. Dist. LEXIS 50003 (D.S.C. June 27, 2008) ................................36

*In re Sony SXRD Rear Projection Television Class Action Litig.*,
    No. 06 Civ. 5173, 2008 U.S. Dist. LEXIS 36093 (S.D.N.Y. May 1, 2008)...........................19

*Taft v. Ackermans*,
    No. 02 Civ. 7951, 2007 U.S. Dist. LEXIS 9144 (S.D.N.Y. Jan. 31, 1992)......................15, 28

*Velez v. Majik Cleaning Servs., Inc.*,
    No. 03 civ 8698, 2007 U.S. Dist. LEXIS 46223 (S.D.N.Y. June 22, 2007)...........................38

*Vilkhu v. City of N.Y.*,
    No. 06-CV-2095 (CPS) (JO), No. 06-CV-2095, 2009 U.S. Dist. LEXIS 73696 ..................30

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
    396 F.3d 96 (2d. Cir. 2005).........................................................................................16, 19

*Weinberg v. Kendrick*,
    698 F.2d 61 (2d Cir. 1982)...............................................................................................15

*Whittington v. Taco Bell of Am.*,
    No. 10-cv-01884, 2013 U.S. Dist. LEXIS 161665 (D. Colo. Nov. 13, 2013).......................14

*Willix v. HealthFirst, Inc.*,
    No. 07 Civ. 1143, 2011 U.S. Dist. LEXIS 21122 (E.D.N.Y. Feb. 18, 2011) ........................19

*Wright v. Stern*,
    553 F. Supp. 2d 337 (S.D.N.Y. 2008) ...............................................................................19

**Statutes**

Fair Labor Standards Act,  29 U.S.C. § 216(b)....................................................... *passim*

29 U.S.C. § 255(a) .............................................................................................................10

**Other Authorities**

Fed. R. Civ. P. 23 ...............................................................................................14, 15, 23, 26

## I.      INTRODUCTION

After more than two years of hard fought litigation the parties have reach a settlement in this case, and are pleased to present it to the Court for approval.

The settlement resolves the claims of 4170 servers, bartenders, and buspersons who worked for the restaurant chain Ruby Tuesday and who opted into this Fair Labor Standards Act case.  The claims in the case were that Ruby Tuesday required or permitted these employees to work "off the clock" either before or after their shifts.

The $3 million settlement will award the Opt-Ins roughly 90% of their estimated actual damages.  Since the litigation was hotly contested between qualified counsel, the settlement should be approved.

Plaintiffs also request attorney's fees in the amount of one-third of the total settlement and reimbursement of expenses as well as service awards for seven Plaintiffs who have worked hard to advance the case.  Because these requests are reasonable and consistent with precedent, they should be approved as well.

## II.     THE LITIGATION

### A.      THE PLEADINGS

Defendant Ruby Tuesday, Inc. owns and operates a chain of over 700 casual dining restaurants throughout the country.

After a thorough investigation which included interviews with many former Ruby Tuesday employees, a review of SEC filings, and an expert financial analysis of Ruby Tuesday's historic and current labor costs, plaintiffs Michael Guttentag and Steven Reeves filed their complaint on April 17, 2012.

In their complaint, Plaintiffs alleged that Ruby Tuesday servers, bartenders and buspersons were not paid for all the time they worked.  Ruby Tuesday, plaintiffs alleged, set up

centralized scheduling, payroll, and incentive structures that forced workers to perform off-the-clock work so as to avoid incurring any overtime.

Plaintiffs alleged that workers: 1) were frequently not allowed to clock in at the start of their shifts until after a pre-shift meeting or after their first customer arrived; 2) were required to clock out at the end of their shifts but then keep working; and 3) sometimes had their time records adjusted back or "shaved" to make sure they did not record over forty hours in a week.

The types of off-the-clock work performed by servers, bartenders and buspersons, plaintiffs alleged, usually included various cleaning tasks, "rolling" silverware for the next day for the servers and buspersons, and extensive pre- and post-shift checklists for the bartenders.

Ruby Tuesday filed its answer on June 8, 2012, denying most of plaintiffs' allegations.

**B.    DISCOVERY**

The parties, after a conference with Judge Baer, agreed to bifurcate discovery with the first phase relating to conditional certification and the second phase relating to merits issues.

In late 2012 the parties conducted discovery in earnest and exchanged almost 5000 pages of documents and responded to dozens of interrogatories.

The documents received by plaintiffs included job descriptions, training materials, documents describing compensations structures, materials relating to Ruby Tuesday's centralized scheduling systems, procedure checklists and manuals, the personnel files and records of the plaintiffs and a selection of time records and personnel schedules.

Following document requests and interrogatories, Ruby Tuesday took the depositions of the plaintiffs, Messrs. Guttentag and Reeves, and also of four other former employees who had opted into the case after the complaint was filed.

Plaintiffs took the depositions of four current Ruby Tuesday employees: two General Managers, a Senior Regional Partner, and Ruby Tuesday's Director of Human Resources Technology.

### C.   COLLECTIVE CERTIFICATION

On March 8, 2013 plaintiffs submitted their motion for collective certification.  Mem. of Law in Supp. of Mot. for Conditional Certification of Collective Class Pursuant to 29 U.S.C. § 216(b) of the FLSA ("Conditional Certification Mot."), ECF No. 26.  Plaintiffs argued that the centralized nature of the staffing policies, the incentive structures and the uniform job duties forced workers to perform off-the-clock work.

Using an analysis of 733 instances in which the documents contained both the scheduled shift start times and actual clock-in times for workers, plaintiffs submitted evidence that workers were clocked in after their scheduled shift time an astounding 96% of the time and by more than five minutes late 88% of the time.  Plaintiffs used this evidence to rebut the contentions of the Ruby Tuesday deponents that pre-shift meetings were merely de minimus time.

Next, plaintiffs assembled anecdotal evidence of post-shift work from plaintiffs and other workers.  The tasks performed after shifts included detailed closing procedures that were set forth in Ruby Tuesday corporate documents for servers, bartenders and buspersons.

By marshaling the discovery, Plaintiff's counsel made the following arguments:

- Ruby Tuesday has a company policy against overtime.  One corporate training document for managers warns them to "never schedule overtime" with a graphic of money being poured down a drain.

- Ruby Tuesday issues uniform staffing and scheduling guidelines for individual restaurants.

- Ruby Tuesday sets labor budgets for individual restaurants at the corporate level. Neither the restaurant managers nor the district manager has any authority to set labor budgets.  Even a regional partner, two levels above restaurant managers,

does not have the authority to increase a restaurant's labor budget in any way that affects Class members.

- Corporate executives micromanage each restaurant's compliance with the labor budgets and take swift action when a manager exceeds his labor budget by even 1%, which one regional partner referred to as being "egregiously" over budget.

- Individual restaurant managers are harshly reprimanded by their superiors for exceeding their labor budgets.

- Quarterly bonuses to the restaurant managers are dependent in part on "making labor," that is, not exceeding their labor budgets.   Such bonuses were dependent upon the restaurant's "Profit After Controllables" or "PAC."   The three most important variables in calculating PAC are labor, food, and beverage costs.   Of the three, local managers have the most control over labor costs by forcing workers to work off the clock.

- The restaurant manager on duty cannot close out the day's work until all employees have clocked out.   Managers regularly clock workers out while they are still working in order start their own closing work.

- At the corporate level Ruby Tuesday closely monitors employees who approach forty hours of work in a week so that those workers can be clocked out before incurring any overtime.   Toward the end of each workweek, a list of employees approaching forty hours is posted in individual restaurant locations to make sure that their hours don't exceed forty.   Employees on this list are regularly targeted for time shaving and required to clock out and keep working.

- Ruby Tuesday's "Micros" system allows management above the store level to receive reports from each restaurant detailing how much overtime a restaurant incurred for each week.

- Managers could easily adjust workers' time records. Any employer at the shift leader level or higher had the authority to adjust time records.   No notification was provided to the employees whose records were adjusted.

- Workers needed a manager to clock them in for the shift, but not to clock out. This permitted managers to force workers to delay clocking in for their shifts and also allowed managers to clock out employees without their knowledge.   Several plaintiffs testified that they attempted to clock out but found that it had already been done.

- A restaurant manager cannot both adhere to her labor budget and effectively manage a restaurant without either requiring workers to work off the clock or requiring them to work overtime hours.

4

Plaintiffs were able to demonstrate the centralized nature of Ruby Tuesday's policies to the Court's satisfaction by showing centralized policies established by Ruby Tuesday's corporate headquarters.

Ruby Tuesday filed its response on April 8, 2013 and argued that a collective action could not be certified because plaintiffs had not met their burden of demonstrating a common practice or policy that applied to all workers.  Def.'s Br. in Opp. to Pls.' Mot. for Conditional Certification of Collective Class Pursuant to 29 U.S.C. § 216(b) of the FLSA ("Opp. to Conditional Certification Mot."), ECF No. 27.  Ruby Tuesday argued that there were differences even among the six declarations submitted by plaintiffs that would preclude a finding of commonality.  Opp. to Conditional Certification Mot. 18, 19.

Ruby Tuesday further argued that the allegations of the declarants were personal to them and did not reflect a broader policy or problem at Ruby Tuesday.  Ruby Tuesday also pointed out the declarants only represented a tiny sample of restaurants.  Defendant also submitted declarations from managers attesting to the lack of wage and hour issues in their districts, and the policy of terminating restaurant managers who did not comply with Ruby Tuesday policy. Accordingly, Ruby Tuesday, argued, the experiences of the plaintiffs could not be generalized to other restaurants.  This was especially true of the Times Square location, where most of the declarants worked, which was unique because of its high volume and location.  Opp. to Conditional Certification Mot. 2, 15, 19.

Ruby Tuesday next opposed plaintiffs' arguments about the staffing software by noting that the software exists not to deter overtime, but to make sure there are enough employees scheduled for a given shift using straight time.  Defendant also explained its wage and hour

compliance and management training polices in great detail.  Opp. to Conditional Certification

Mot. 19.

Plaintiffs filed their reply on April 23, 2013.  Reply Mem. in Further Supp. of Pls.' Mot.

for Conditional Certification of Collective Class Pursuant to 29 U.S.C. § 216(b) of the FLSA

("Reply in Further Supp. of Conditional Certification Mot."), ECF No. 28.   Plaintiffs

characterized defendant's arguments as a typical "rogue manager" defense and argued that the

existence of a facially lawful compliance policy did not shield them from liability. Plaintiffs also

argued that in the presence of common corporate policies, the testimony of the declarants was

sufficient to infer commonality on a national scale.

The Court granted plaintiffs' motion for conditional certification on June 11, 2013.  The

Court stated that:

> Plaintiffs' declarations and depositions cover at least eight store locations in four
> states. But more importantly, such evidence is complemented by both
> documentary evidence and depositions that support Plaintiffs' contention that
> Defendant has a nationwide policy that at least is reticent to pay for overtime
> work by its employees, as well as a centralized staffing and labor budget
> management system…
>
> ***
>
> But even more significant is the evidence that Defendant has a companywide
> policy of prohibiting overtime work, a centralized timekeeping system that allows
> Defendant to track each restaurant's overtime record, and a uniform bonus policy
> that applies to all restaurant managers, which considers, among others, the
> restaurant's labor costs. *Id.* Ex. 14; Ex. 7, at 46-47, 126; Ex.13. Plaintiffs have
> also identified Defendant's centralized system of staffing all of its restaurants
> using the same software program and updating the staffing plans on a quarterly
> basis at the level of its regional directors, rather than at the level of individual
> restaurants.

Opinion & Order at 4, ECF No. 30 (June 11, 2013).

By letter of June 20, 2013, Ruby Tuesday asked Judge Baer to reconsider his conditional

certification order.  ECF No. 32.  Defendant argued that the plaintiffs had only shown off-the-

clock work at a limited number of locations and that the facts adduced by plaintiffs and precedent justified certification of a much smaller group of workers.

Plaintiffs responded by letter brief on June 24, 2013, and argued that reconsideration was not required under the circumstances and arguing against a reduction in the scope of the class.

Judge Baer denied Defendant's request on July 12, 2013, noting that Ruby Tuesday had not submitted any controlling authority that had been overlooked and that the existence of a valid compliance policy did not mean that it was always followed. The Court also acknowledged the small sample size of plaintiffs' declarants, but stated that the case law appeared to support their use.

### D.    NOTICE

Following the collective certification decision, plaintiffs undertook a comprehensive, very expensive, and at times contentious notice process to ensure that the broadest number of workers had the opportunity to join the case.

### 1.    THE INITIAL NOTICE

After extensive negotiations between the parties and approval by Judge Baer, the initial notice was sent to 82,388 workers on by first class mail on November 7, 2013.  *See* Declaration of Christopher M. Walsh, Esq. (the "Walsh Decl.") at ¶¶ 3-5, attached as Exhibit A to the Declaration of Adam Gonnelli in Support of Motion to Approve Settlement, Award Attorneys' Fees and Expenses, and Grant Service Awards (the "Gonnelli Decl.").  The notice provided workers with a description of the case, the opportunity to join, the legal effect of joining or not joining, contact information for the attorneys, and how to obtain more information or a copy of the notice in Spanish.  A copy of the notice is submitted herewith as Exhibit B to the Gonnelli Declaration.

### 2.  THE REMINDER NOTICE

On December 5, 2013 a reminder notice, in the form of a postcard, was sent to all the workers except those who had already opted in, a total of 80,229.  *See* Declaration of Claims Administrator in Support of Approval of Settlement (the "Baldwin Decl.") ¶ 6, attached as Exhibit C to the Gonnelli Decl.  The postcard notice provided a reminder that the deadline to opt into the case was approaching, contact information for the attorneys, and the website address with full notice.  A copy of the reminder notice is submitted as Exhibit D to the Gonnelli Declaration.  As of the date of the reminder notice, 1840 workers had opted into the case.  Baldwin Decl. ¶ 4.

### 3.  THE SUPPLEMENTAL NOTICE FOR UNDELIVERABLE ADDRESSES

As of late December 2013, of the 82,388 notices that were sent out, 11,369 were returned as undeliverable.  *See* Walsh Decl. ¶ 8.  Following an exchange of letters to the Court and some contentious argument, the parties agreed to conduct a test with a small sample of the undeliverables.  With the Court's approval, Ruby Tuesday provided social security numbers for 200 undeliverables.  Plaintiffs' counsel instructed the claims administer to perform searches for valid addressers with this new information.  As a result, the claims administrator was able to find valid addresses for 141 of the 200 workers, a 70% success rate.  *See* Walsh Decl. ¶ 11.

Again with Judge Baer's approval, Ruby Tuesday then provided social security numbers for the rest of the undeliverables and Plaintiffs' counsel, through the claims administrator, mailed a notice to the new addresses.  *See* Walsh Decl. ¶ 13.  The deadline for responses was also extended to allow for the new mailing.

### 4.        REPORTS OF RETALIATORY THREATS

During the notice period, Plaintiffs' counsel received five reports of retaliatory threats and dissemination of misinformation about the case being directed to current Ruby Tuesday workers.  Plaintiffs' counsel informed the Court and requested a supplemental notice to clarify that workers would not be subject to retaliation and that the notice was part of a legitimate court-authorized process.  Ruby Tuesday investigated all five instances and could not find supporting evidence of four of the reports, and corrected the fifth instance which related to a manager who did not know about the case and told a worker that the notice was probably part of a "scam." Ruby Tuesday instructed the management of that restaurant to tell the workers that the notice was part of a legitimate court-authorized process.

However, Plaintiffs' counsel remained deeply troubled by these reports and also by the likelihood that similar conduct may have gone unreported.  After more negotiation and a conference with Judge Baer, Ruby Tuesday agreed to post a supplemental notice drafted by Plaintiffs' counsel on the computer portal that Ruby Tuesday workers accessed each day.  The notice read:

> Servers, bartenders, and food runners:
>
> There have been questions raised about the notice of a lawsuit you may have received in the mail concerning a collective action lawsuit on behalf of certain front-of-the-house workers.
>
> It is the policy of Ruby Tuesday that there will be no retaliation or negative consequences of any kind if you choose to join the case.  This policy has been made clear to all restaurant managers.
>
> Ruby Tuesday will not tolerate retaliation and takes this matter very seriously.  If you experience any threats relating to this case or have any questions, you may call the Legal Department at the Restaurant Support Center at ext. 5711 or Adam Gonnelli, Esq., the lawyer for the plaintiffs in the lawsuit, at 877.247.4292.  You may also learn more about the case at www.RubyTuesdayLawsuit.com.   There have been no findings by the court of any wrongdoing by Ruby Tuesday.

After these steps were taken,[1] Plaintiffs' counsel did not receive any further reports of misinformation or threats of retaliation.

As a result of the notice process, 4170 workers in total opted in to the case.

### E.    DAMAGE CALCULATIONS

In January of 2014 Plaintiffs counsel sent an email to 2476 workers asking them for their estimates of off-the-clock work.  Plaintiffs' counsel received over 700 responses.  There were extreme outliers on both ends of the spectrum, with a tiny handful saying they did not work off the clock at all and some saying that they worked more than half of their time off the clock. However, a tabulation of the survey responses yielded a consensus estimate that workers were not being paid for 10-20% of their time.

Plaintiffs decided to base their damages estimate for settlement purposes on the number of recorded hours worked by the Opt-In workers during the applicable class period.  For the FLSA claims, the statute of limitations for willful violations is three years.  29 U.S.C. § 255(a). However, some of the state law limitations periods are longer.  Most notably, New York's is six years and Kentucky's is five years, both states with large numbers of Ruby Tuesday restaurants. Accordingly, plaintiffs included the hours worked by Opt-Ins further back than three years where appropriate.

Also, many states have tip-credit minimum wages in excess of the federally-mandated $2.13.  For example, New York's is $5.00 per hour, Connecticut's is $5.69 for servers and buspersons and $7.34 for bartenders, and in Illinois it is $4.95.  Plaintiff took these differences into account in damage calculations as well.

---

[1]   Ruby Tuesday had already advised its above-store managers of the existence of the case twice, on October 23, 2013 and November 14, 2013, and stated that it would not tolerate retaliation for joining or asking questions about the lawsuit.

At plaintiffs' request, Ruby Tuesday provided the recorded hours for each of the 4170 Opt-Ins.

Plaintiffs created a chart of all the Opt-Ins containing their state's statute of limitations, tip-credit minimum wage, and total number of recorded hours worked.  In 238 cases, employees worked for Ruby Tuesday in more than one state, so their recovery for each state was separately calculated based on the appropriate statute of limitations and tip credit and then added together.

The total number of recorded hours among the Opt-Ins was 3,868,801.  Using the appropriate tip-credit minimum wage, the total earned for those hours was $12,489,180.10.

Assuming the Opt-Ins worked an additional 10% − 20% of uncompensated time, they would have earned between $1,248,918.01 and $2,497,836.02.  The midpoint of that range is 15, or $1,873,377.02.

## F.      THE SETTLEMENT

The parties had discussed resolving the case in general terms a few times during the course of the litigation, but these conversations did not make much progress.  In mid-2013, the discussions became more serious and the parties agreed to mediation with the Honorable Kathleen Roberts of JAMS.

The parties participated in two mediation sessions, one on September 6, 2013 and one on February 18, 2014.  The first was largely unsuccessful although the parties made some progress in understanding the other's damage calculations.  Much more progress was made at the second mediation and the parties, under the auspices of Judge Roberts, exchanged substantive damage estimates, which narrowed the gap between the parties significantly.  However, no settlement was reached at the second mediation either.

Both sides began to prepare for the next round of discovery and motion practice. However, in a series of phone calls and emails through the mediator over the next few weeks, the

basic terms of the settlement were hammered out. The parties came to a final agreement on March 25, 2014.

The Stipulation of Settlement and Release ("Settlement Agreement")[2] provides for:

- $1,675,000 to be distributed to the Opt-Ins;

- Up to $50,000 in service payments to the named plaintiffs and certain other Opt-Ins;

- Up to $1,000,000 in attorneys' fees;

- Up to $275,000 in litigation expenses;

- Half of the award to the Opt-Ins will be treated as wages;

- Ruby Tuesday will pay the employer's share of payroll taxes on the portion of the payments to the Opt-Ins that are designated as wages;

- Any attorney's fees or expenses that are not approved by the Court will revert to Ruby Tuesday;

- The recipients of the service payments will execute general releases;

- All other Opt-Ins will release their state and federal wage and hour claims; and

- The Florida and New York state class claims will be dismissed without prejudice.

In late June, Plaintiff's counsel sent an email to the Opt-Ins for which there were valid email addresses, and letters through the mail to those for which there were not. The letter advised the Opt-Ins that a settlement had been reached pending court approval and that

---

[2] Attached as Exhibit E to Gonnelli Decl.

Plaintiffs' counsel would follow up with an individualized estimate of the amount they could expect to receive if the settlement was approved.

The response to this email was overwhelmingly positive, including:

- "I'm glad I'm getting what I deserve, and I wouldn't have gotten it without you."

- "Thank you so much for taking the case and caring."

- "Thank you so much for taking on our rights as servers and for all restaurant workers.  It is appreciated."

- "I wanted to personally email you and say thank you for all of your hard work and extra time you have put into this case.  I was worked a lot off the clock and taken advantage of, and I never thought a day would come where somebody would stand up for all of us employees and fight for what's right."

- "Well hallelujah, it's nice to know someone stands up for the little guys.  Thank you very much; it's a relief all the time spent at the back booth growling about this, that something was finally done about it.  Again, thank you and also Mike and Steve.  Best regards."

- "Thank The Lord for you and your coworkers' dedication to getting us our money!!  Thank you again!!!!"

On August 13, 2014 the claims administrator, on Plaintiffs' counsel's behalf, sent an individualized email or letter to each Opt-In with an estimate of the amount the worker would receive under the settlement.   Plaintiff's counsel decided to set a minimum award of $25 for each worker.  The estimated awards ranged from the minimum to over $9,000.  Baldwin Decl. ¶ 11.

The workers were also advised that they could opt out and pursue their own claims if they did not want to accept the award.  Everyone was also provided a copy of the Settlement Agreement.

Again, the response has been overwhelmingly positive.  As of the date of this motion, not a single worker has opted out.

## III.   LEGAL ARGUMENT

### A.   THE SETTLEMENT SHOULD BE APPROVED

#### 1.   STANDARDS FOR APPROVAL OF AN FLSA SETTLEMENT

As this Court has noted, "the standard for approval of an FLSA settlement is lower than for a class action under Rule 23." *Flores v. Anjost Corp.*, No. 11 Civ. 1531, 2014 U.S. Dist. LEXIS 11026, at *19 (S.D.N.Y. Jan. 29, 2014); *see also Massiah v. Metroplus Health Plan, Inc.*, No. 11-cv-05669, 2012 U.S. Dist. LEXIS 166383, at *13 (E.D.N.Y. Nov. 20, 2012) (same); *Henry v. Little Mint Inc.*, No. 12 Civ. 3996 (CM), 2014 U.S. Dist. LEXIS 72574, at *18 (S.D.N.Y. May 23, 2014) (same, citing *Massiah,* 2012 U.S. Dist. LEXIS 166383).   This is because in an FLSA settlement, workers affirmatively opt into the case and are thus plaintiffs before the court.  In this case, unlike Rule 23 actions, each worker has the opportunity to accept or reject what amounts to an individual settlement offer.  *See Whittington v. Taco Bell of Am.*, No. 10-cv-01884, 2013 U.S. Dist. LEXIS 161665, at *5 (D. Colo. Nov. 13, 2013).  Accordingly, the same due process concerns do not apply as in a Rule 23 class action where the interests of absent class members must be protected.  *Flores*, 2014 U.S. Dist. LEXIS 11026, at *18.

"Courts approve FLSA settlements when they are reached as a result of contested litigation to resolve *bona fide* disputes."  *Flores*, 2014 U.S. Dist. LEXIS 11026, at *19 (citing *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1353 n.8 (11th Cir. 1982).  "Typically, courts regard the adversarial nature of a litigated FLSA case to be an adequate indicator of the

fairness of the settlement." *Massiah*, 2012 U.S. Dist. LEXIS 166383, at *14. Here, this litigation was hotly contested. The parties vigorously litigated all aspects of the case and settled only after two mediation sessions and protracted arms' length negotiations.

In addition, both sides were represented by counsel experienced in wage and hour litigation. Ruby Tuesday's counsel, Constangy, Brooks & Smith, LLP, is a national labor and employment defense law firm with over 60 years of experience in representing employers in all aspects of labor and employment law. More specifically, James M. Coleman and Maureen R. Knight have over 45 years of collective experience in defending complex wage and hour collective and class action litigation, including collective actions under the Fair Labor Standards Act. Plaintiffs' counsel, Faruqi & Faruqi LLP, has successfully prosecuted wage and hour cases all over the country and litigated them at every level, including the U.S. Supreme Court. The firm has a long track record of success in employment and class action litigation. The lead lawyer in this case, Mr. Gonnelli, has chaired Faruqi's Wage Theft Group since 2012. *See* Faruqi Firm Resume, attached as Exhibit F to the Gonnelli Decl.

Accordingly, this FLSA settlement should be approved.

## 2.   THIS SETTLEMENT ALSO SATISFIES THE RULE 23 STANDARD

Although this is an FLSA-only settlement, the settlement also satisfies the higher Rule 23 standard. In evaluating a Rule 23 settlement, courts evaluate both the procedural and substantive fairness of a proposed settlement. *Weinberg v. Kendrick*, 698 F.2d 61, 73-74 (2d Cir. 1982). Procedural fairness is how the settlement was reached, including the absence of collusion. *Taft v. Ackermans*, No. 02 Civ. 7951, 2007 U.S. Dist. LEXIS 9144, at *14-15 (S.D.N.Y. Jan. 31, 1992). Substantive fairness examines the settlement in the context of what might have been achieved at

trial.  *Malchman v. Davis*, 706 F.2d 426, 433 (2d. Cir. 1983).   This settlement is both procedurally and substantively fair.

### a)   PROCEDURAL FAIRNESS

Procedural fairness is evaluated by examining the negotiating process leading to the settlement.  *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d. Cir. 2005).  This settlement is the product of arms' length negotiations conducted over months by qualified counsel after substantial discovery and with the assistance of two mediations.  Accordingly, the settlement is procedurally fair.

### b)   SUBSTANTIVE FAIRNESS

Courts in the Second Circuit review proposed settlements for fairness using the factors set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974).  "In evaluating substantive fairness, it is well settled that the District Court must consider the nine *Grinnell* factors…." *McReynolds v. Richard-Cantave*, 588 F.3d 790, 804 (2d Cir. 2009).   The nine *Grinnell* factors are:

> (1) [T]he complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of discovery and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendant to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Grinnell*, 495 F.2d at 463 (citations omitted).  A consideration of these factors supports approval of the settlement.

### (i)   THE COMPLEXITY, EXPENSE AND LIKELY DURATION OF THE LITIGATION

Under this factor, courts examine the benefits of the settlement against the expense of continued litigation. "'[M]ost class actions are inherently complex and settlement avoids the

costs, delays, and multitudes of other problems associated with them.'" *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 184-85 (W.D.N.Y. 2005). Here, continued litigation would drive up costs exponentially.

Although the parties have engaged in significant discovery, much more would be required before trial.  In preparation for a decertification motion, Ruby Tuesday would want to conduct discovery and depose a sample of the Opt-In plaintiffs.  Even a sample of 1% would mean document requests, interrogatories, and depositions of forty workers.  In all likelihood, that number would be higher.

From the plaintiffs' perspective, deeper discovery would have to be conducted of Ruby Tuesday's General and District managers around the country to ensure an adequate sample to demonstrate common policies.  With over 700 restaurants at issue and mindful of Judge Baer's July 12, 2013 statement in denying Ruby Tuesday's request for reconsideration "I agree a larger sample of Ruby Tuesday restaurants would have been preferable…", such discovery would have to be expansive and thorough.  Endorsed Letter from James M. Coleman to Judge Harold Baer at 9, ECF No. 32 (July 12, 2013).

Additional discovery would also have to be conducted on the details of Ruby Tuesday's schedule setting software, which would likely require retention of an expert.

If plaintiffs were successful in defeating a decertification motion, a trial would consume enormous resources.  Any trial involving off-the-clock work is extremely fact-intensive and the damages issue might be the most hotly contested of all.  In addition, any judgment would likely be appealed, further prolonging the litigation.

If plaintiffs were to lose the decertification motion, the litigation might become even more complex and costly.  Under those circumstances, plaintiffs would seek to bring district-by-

district or even restaurant-by-restaurant actions.  With 4170 plaintiffs, if even a modest percentage brought new and smaller actions, Ruby Tuesday might be forced to defend dozens of cases around the country.

The settlement, by contrast, "makes monetary relief available to class members in a prompt and efficient manner."  *Johnson v. Brennan*, No. 10 Civ. 4712 (CM), 2011 U.S. Dist. LEXIS 105775, at *26 (S.D.N.Y. Sept. 16, 2011) (approving wage and hour settlement with 394 workers).  Accordingly, this factor supports approval.

### (ii)     THE REACTION OF THE CLASS TO THE SETTLEMENT

The reaction of the workers to the settlement has been overwhelmingly positive.  *See, e.g. supra* p.13.  One court in the Southern District of New York even called this factor "perhaps the most significant factor" in the *Grinnell* analysis.     *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002); *Johnson*, 2011 U.S. Dist. LEXIS 105775, at *26 (stating the lack of objections itself is evidence of fairness (citing *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587, 2003 U.S. Dist. LEXIS 8239, at *4 (S.D.N.Y. May 15, 2003)).

Of the 4170 Opt-In plaintiffs, not a single one has opted out of the case.  This is especially significant because as a group, the workers who opted in to the case have been very active and interested in the litigation.  Plaintiffs' counsel has fielded hundreds of calls and emails checking up on the status of the litigation and asking for additional information.  Many have called to offer information and help with the case.  When counsel contacted the Opt-Ins for the survey, to inform them of the settlement, and to provide the estimated award, counsel received hundreds of responses in each instance.  Accordingly, the fact that an energized and interested group is universally in favor of the settlement speaks volumes.

The positive reaction of the class favors approval of the settlement. *See Willix v. HealthFirst, Inc.,* No. 07 Civ. 1143, 2011 U.S. Dist. LEXIS 21122, at *4 (E.D.N.Y. Feb. 18, 2011) (nine opt outs and objections out of 2,025 class members indicative of fair settlement); *Wright v. Stern*, 553 F. Supp. 2d 337, 344-45 (S.D.N.Y. 2008) (16 out of 3,500).

### (iii)    THE STAGE OF DISCOVERY AND THE AMOUNT OF DISCOVERY COMPLETED

Under this factor, courts evaluate whether "the parties conducted sufficient discovery to understand their claims and negotiate settlement terms." *In re Sony SXRD Rear Projection Television Class Action Litig.*, No. 06 Civ. 5173, 2008 U.S. Dist. LEXIS 36093, at *20 (S.D.N.Y. May 1, 2008). Plaintiffs' counsel is confident that they have a thorough understanding of the claims and damages of their clients. The parties reviewed over 5000 pages of documents and conducted ten depositions. In addition, Plaintiffs' counsel surveyed the Opt-Ins to gain a better understanding of the amount of off-the-clock work and had dozens of telephonic conversations with Ruby Tuesday current and former employees to obtain a better understanding of the common policies at issue in the case. *See Johnson*, 2011 U.S. Dist. LEXIS 105775, at *28 (approving settlement under *Grinnell* factors and noting that plaintiffs obtained payroll records and employee manuals). Thus, the stage of discovery factor supports approval of the settlement.

### (iv)    AND (v) THE RISKS OF ESTABLISHING LIABILITY AND DAMAGES

Although Plaintiffs' counsel was at all times confident in the case, no case is without risks. *See, e.g., Wal-Mart*, 396 F.3d at 118. Here, there were very significant risks in establishing damages in this case. Off-the-clock cases, by definition, are very fact intensive. Since there is no documentary evidence to rely on in proving off-the-clock work, it is difficult to predict how a finder of fact would determine damages. The fact finder might have used some sort of average, accepted a defense expert's formulation, or simply sharply reduced Plaintiffs'

counsel's estimates. Accordingly, there is no guarantee that a trial would have resulted in a greater recovery than this settlement. *See In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997) ("[D]amages are a matter for the jury, whose determinations can never be predicted with certainty.").

The risks inherent in establishing liability and damages in this case strongly support approval of the settlement.

### (vi)    THE RISKS OF MAINTAINING THE CLASS ACTION THROUGH TRIAL

There would have been substantial risks in maintaining the collective action status of this case through trial.  After discovery, defendants would have likely brought a motion to decertify the collective action. Although Plaintiffs' counsel believes the common course of conduct in having employees work off-the-clock and in not paying overtime would have carried the day for plaintiffs, a court may have agreed with defendants that the disparities in job responsibilities, differences in pay structures, and differences in practices at different restaurants would defeat collective action certification.

Just two weeks ago a court in the Southern District of Florida decertified a case involving servers and bartenders working for a national chain of restaurants.  *Mathis v. Darden Rests.*, No. 12-61742-CIV-DIMITROULEAS, 2014 U.S. Dist. LEXIS 124631 (S.D. Fla. Sept. 1, 2014). The arguments in the *Darden* case were similar to those that would be made on a decertification motion here.  In *Darden*, the plaintiffs argued that the existence of common timekeeping and payroll systems, common training and complaint procedures, and the same job duties among the bartenders and servers permitted final collective certification.  *Id.*

The defendants argued that the workers held "different positions at different restaurants in different locations under different policies implemented by different managers."   Also,

defendants argued that the existence of individual defenses would make collective treatment too cumbersome. *Id*.

The court agreed with defendant on nearly all issues: "[T]he Opt-In Plaintiffs have disparate factual and employment settings[.]" *Id*. at *13. With respect to defenses, the Court held that: "The defenses require consideration of an individual Opt-In Plaintiff's total hours worked, total compensation, type of work, and subjection to a tip-credit rate. Those material inquires cannot be generalized across 20,255 servers and bartenders who worked across 1,995 distinct restaurant locations, each with unique practices as to side work and clock-in policies." *Id*. at *15.

The Court concluded that "There are too many material dissimilarities between Opt-In Plaintiffs' employment circumstances in terms of job titles, job locations, tip-credit rates, off-the-clock policies, and managerial conduct. Consequently, it is not more practical, efficient, or fair to proceed as a collective action." *Id*. at *18.

Plaintiffs believe that while there are a great many superficial similarities between this case and *Darden* – the same industry, the same jobs and the same legal issues—this case involves a more cohesive and certifiable class because of the degree of control exercised by Ruby Tuesday headquarters. Nonetheless, a considerable risk exists that once expensive and time-consuming discovery is concluded, the Court might agree with the *Darden* analysis and decertify the collective class. As one court said, "[r]isk, expense and delay permeate such a process." *Johnson*, 2011 U.S. Dist. LEXIS 105775, at *31.

### (vii)   THE ABILITY OF THE DEFENDANT TO WITHSTAND A GREATER JUDGMENT

Ruby Tuesday is a large, publicly traded corporation. Under normal circumstances, such a company would easily be able to absorb a $3 million settlement. However, during the

pendency of this litigation, significant questions were raised about Ruby Tuesday's financial health.

  *See, e.g.,* Dan Moskowitz, *Should Ruby Tuesday Investors Remain Hopeful?*, The Cheat Sheet (Jan. 10, 2013), http://wallstcheatsheet.com/stocks/should-ruby-tuesday-investors-remain-hopeful.html/?a=viewall ("At the present time, Ruby Tuesday has weak margins, limited growth potential…"); Rick Aristotle Munarriz, *Ruby Tuesday is Doing Even Worse Than Red Lobster*, Investor Center (Jan. 9, 2014), http://www.dailyfinance.com/on/ruby-tuesday-worse-darden-red-lobster/  ("The struggling casual dining chain posted another dreadful quarterly report on Wednesday afternoon."); *Ruby Tuesday Not Looking Tasty to Investors*, Forbes (Jan. 17, 2014), http://www.forbes.com/sites/zacks/2014/01/17/ruby-tuesdays-not-looking-tasty-to-investors/  ("RT has clearly been falling behind its competitors, as it has seen a struggling stock price, and it continues to have an extremely bearish outlook."); Rich Duprey, *Ruby Tuesday Needs Better Tricks than This to Survive*, The Motley Fool (Apr. 23, 2014), http://www.fool.com/investing/general/2014/04/23/ruby-tuesday-needs-better-tricks-than-this-to-surv.aspx. ("Investors should be wary of buying into this perennial turnaround story.").  *See* Exhibit G to the Gonnelli Decl.

  Accordingly, the settlement removes the risk of non-payment.

### (viii)  AND (ix) THE RANGE OF REASONABLENESS OF THE SETTLEMENT IN LIGHT OF THE BEST POSSIBLE RECOVERY AND THE RISKS OF LITIGATION

  In addition to the reaction of the class, courts have also called this factor the most important of the *Grinnell* factors.  "The most important factor in the court's assessment of the proposed settlement is the 'strength of the case for plaintiffs on the merits, balanced against the [amount] offered in settlement." *D.S. v. New York City Dep't of Educ*, 255 F.R.D. 59, 78 (E.D.N.Y. 2008) (quoting *Grinnell*, 495 F.2d at 455).

The determination of whether a settlement amount is reasonable does not involve the use of a mathematical equation yielding a particularized sum. *Flores*, 2014 U.S. Dist. LEXIS 11026, at *18 (citing *Frank*, 228 FRD at 186). "In fact, there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the… recovery." *Grinnell*, 495 F.2d at 455 n.2. In addition, "when settlement assures immediate payment of substantial amounts of class members, 'even if it means sacrificing "speculative payment of a hypothetically larger amount years down the road,"' settlement is reasonable under this factor." *Johnson*, 2011 U.S. Dist. LEXIS 105775, at *34.

However, plaintiffs have done much better than a small fraction of the potential recovery here. The best estimate obtained by Plaintiffs' counsel was that on average, the Opt-Ins worked a range of 10-20% of the time off the clock. This settlement provides roughly 90% of the midpoint of actual damages.

The risks of determining the existence or amount of damages in an off-the-clock case, where, by definition, there are no records of the unpaid time, are readily apparent. Even had plaintiffs succeeded at trial, there is no guarantee a finder of fact would have awarded plaintiffs more than they are receiving in this settlement. Given that, plus the risks of decertification in light of the recent *Darden* case, the ultimate outcome of this litigation is far from clear.

Plaintiffs' counsel submits that this is an excellent result and militates in favor of the fee award.

Thus, the settlement satisfies not only the applicable FLSA standard, but also the higher Rule 23 standard and should be approved.

### B.   THE FEE IS REASONABLE AND SHOULD BE APPROVED

Successful counsel is awarded attorneys' fees in wage and hour cases under the Fair Labor Standards Act, 29 U.S.C. § 216(b): ("The court in such action shall, in addition to any

23

judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."). Here, Plaintiffs' counsel has negotiated a fee with the defendants of $1,000,000, which is eminently reasonable under the circumstances.

As this Court has noted, courts have discretion to award attorneys' fees based on the lodestar or the percentage-of-recovery method. *Flores*, 2014 U.S. Dist. LEXIS 11026, at *22. *See also McDaniel v. Cnty. of Schenectady*, 595 F.3d 411, 417 (2d Cir. 2010) (courts in the Second Circuit may use either method). The trend, and public policy, is to use the percentage method. *Flores*, 2014 U.S. Dist. LEXIS 11026, at *22. However, the fee request is reasonable under either approach.

## 1. THE REQUESTED FEE IS REASONABLE UNDER THE PERCENTAGE APPROACH

Plaintiffs' counsel requests one-third of the settlement amount in attorneys' fees. This request is "consistent with the norms of class litigation in this circuit." *Flores*, 2014 U.S. Dist. LEXIS 11026 at *23-24 (citing *McMahon v. Oliver Cheng Catering & Events, LLC*, No. 08 Civ. 8713 (PGG), 2010 U.S. Dist. LEXIS 18913 (S.D.N.Y. Mar. 3, 2010) and collecting cases where one-third was awarded in FLSA cases); *Massiah*, 2012 U.S. Dist. LEXIS 166383, at *18 (citing *Toure v. Amerigroup Corp.*, 10 Civ. 5391 (RLM), 2012 U.S. Dist. LEXIS 110300, at *17 (E.D.N.Y. Aug. 6, 2012) and collecting cases).[3]

---

[3] It should be noted that Plaintiffs' counsel negotiated the attorneys' fees separately from the recovery to the Opt-Ins. Gonnelli Decl. at ¶ 8. This supports the fee request:

> Although plaintiffs' counsel seeks an attorney's fee award of 35.3% of the total fund, a slightly higher percentage than the traditional one-third contingency award, … the fact that the attorney's fee award was negotiated separately from the settlement award for class members, together prompt the court to find that the requested amount of attorney's fees is fair and reasonable.

*Gay v. Tri-Wire Engineering Solutions, Inc.*, No. 12-cv-2231, 2014 U.S. Dist. LEXIS 232, at *35 (E.D.N.Y. Jan. 2, 2014)

The Second Circuit has set forth six factors to apply when using the percentage method in a common fund case:

(1)     the time and labor expended by counsel;

(2)     the magnitude and complexities of the litigation;

(3)     the risk of the litigation;

(4)     the quality of representation;

(5)     the requested fee in relation to the settlement; and

(6)     public policy considerations.

*Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000).

### a)      THE TIME AND LABOR EXPENDED BY COUNSEL

The time and labor expended by counsel is equal to a lodestar of $866,770.75. In addition, Plaintiffs' counsel incurred $291,535.46 in expenses (including projected settlement administration costs). Under a lodestar analysis, the requested fee award is only a multiple of lodestar of 1.15, well within, and indeed below, the norm in the Second Circuit. *See Johnson*, 2011 U.S. Dist. LEXIS 105775, at *58 (noting that "Courts regularly award lodestar multipliers from two to six times lodestar[]" and collecting cases); *Henry*, 2014 U.S. Dist. LEXIS 72574, at *44 ("In fact, the [1.9] multiplier is at the lower end of the range routinely granted by courts…"); *Maley*, 186 F. Supp. 2d at 371 (awarding fee and noting 4.65 multiplier is "modest").

The requested fee award will also compensate Plaintiffs' counsel for time spent administering the settlement in the future. *See Flores*, 2014 U.S. Dist. LEXIS 11026, at *26 ("In

---

Also, if the Court does not award the full requested fee and expenses, the remainder reverts to Ruby Tuesday, not to the Opt-Ins. *See* Settlement Agreement at 4. This also supports the fee request because the recovery of the Opt-Ins is fixed, and more money for counsel does not mean less money for the Opt-Ins. Thus, the "tension" that courts recognize exists in common fund fee applications is not present here. *McBean v. City of N.Y.*, 233 F.R.D. 377, 392 (S.D.N.Y. 2006) ("If, however, money paid to the attorneys is entirely independent of money awarded to the class, the Courts fiduciary role in overseeing the award is greatly reduced, because there is no conflict of interest between attorneys and class members.").

wage and hour cases, Class Counsel are often called upon to perform work after the final approval hearing, including answering class member questions, answering questions from the claims administrator, and negotiating and sometimes litigating disagreements with defendants about administering the settlement and distributing the fund."); *Parker v. Jekyll & Hyde Entm't Holdings, LLC*, No. 08 Civ. 7670 (BSJ) (JCF), 2010 U.S. Dist. LEXIS 12762 (S.D.N.Y. Feb 9, 2010) (awarding 1.55 multiplier to lodestar in restaurant wage and hour case and noting that multiplier will diminish due to post-approval settlement administration); *Johnson*, 2011 U.S. Dist. LEXIS 105775, at *48 (noting that future work covered in settlement award supports fee application). With 4170 Opt-Ins, there will no doubt be considerable post-approval work in this case. This fact supports the requested fee.

### b) THE MAGNITUDE AND COMPLEXITIES OF THE LITIGATION

The magnitude and complexity of the litigation also supports the fee request. In terms of the complexity of the litigation, the United States Supreme Court has stated that "FLSA claims typically involve complex mixed questions of fact and law … These statutory questions must be resolved in light of volumes of legislative history and over four decades of legal interpretation and administrative rulings." *Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 743 (1981). Among FLSA cases the most complex type is the "hybrid" action, where state law claims are brought as well. *Johnson*, 2011 U.S. Dist. LEXIS 105775, at *49. Although no Rule 23 classes are being settled here, the state law claims of the Opt-Ins are. Accordingly, counsel had to undertake a through consideration of the law of every state law in which an Opt-In resided. This included a merits analysis as well as a damage analysis. *See supra* II.E.

Importantly, was a case involving over 4000 plaintiffs scattered around the country against a public company for which records to prove plaintiffs' claims did not exist. *See Henry*,

2014 U.S. Dist. LEXIS 72574, at *36-37 (holding that size and difficulty of multi-location case covering more than 1,500 individuals supported fee award); *Jemine v. Dennis*, 901 F.Supp. 2d 365, 392 (E.D.N.Y. 2012) (noting that large number of plaintiffs increases the complexity of the litigation).

Like here, the court in *Johnson*, 2011 U.S. Dist. LEXIS 105775, at *51, acknowledged that the "fact-intensive inquiry" of determining the tasks performed by food service workers "contributed to the complexity of this case because Defendants' witnesses disputed the facts…". Accordingly, this factor supports the fee request.

**c)      THE RISK OF THE LITIGATION**

The risk of the litigation, addressed *supra* at II.A.2.b.(iv)-(vi), also strongly favors the award.  At least one court, in evaluating the *Goldberger* factors, has called the risk of litigation "perhaps the foremost factor to be considered in determining [the] award [of appropriate attorneys' fees]."  *In re Elan Sec. Litig.*, 385 F. Supp. 2d 363, 374 (S.D.N.Y. 2005).

Here, plaintiffs faced significant risks on damages and certification.  On damages, in a case where there were no documents to support an accurate calculation of off-the-clock hours, plaintiffs relied on a survey and anecdotal evidence.  It is far from certain that a finder of fact would award Opt-Ins a greater amount then they are recovering in this settlement.

Decertification is also a risk, where, in addition to the inherent complexity and difficulty trying to certify a national class of workers in hundreds of different restaurants around the country, the recently decided *Darden* case has presented another obstacle.  In *Darden*, a case involving waitstaff at a national chain of restaurants, the court agreed with many of the arguments that Ruby Tuesday has made in this case.  *See supra* pp. 20-21.  Accordingly, the risks of litigation militate in favor of a settlement now.

27

In addition, Plaintiffs' counsel risked $235,267 in expenses.  *See, e.g., Perdue v. Kenny A*, 559 U.S. 542, 543 (2010) (extraordinary outlay of expenses supports fee).

### d)      QUALITY OF REPRESENTATION

The "quality of representation" factor under *Goldberger* conflates the recovery obtained and the backgrounds of the lawyers in the case.  *Taft v. Ackermans*, No. 02 Civ. 7951 (PKL), 2007 U.S. Dist. LEXIS 9144, at *28 (S.D.N.Y. Jan. 31, 2007).  The recovery for the Opt-Ins is excellent.  Out of an estimated damages range of $1,248,918.01 to $2,497,836.02, *see supra* III.E, the Opt-Ins will receive roughly 90% of the midpoint of actual damages.  Given the risks of continued litigation, this is an outstanding result.

Plaintiffs' counsel practices only contingent complex litigation and enjoys a very good reputation in the plaintiffs and the legal community.  According to Judge Freda L. Wolfson of the District of New Jersey, in reference to Plaintiffs' counsel, "Plaintiffs Co-Lead Counsel have conducted the litigation and achieved the Settlement with skill, perseverance and diligent advocacy."  *See* Firm Resume, Gonnelli Decl., Ex. F.

### e)      THE FEE IN RELATION TO THE SETTLEMENT

The fifth factor, the fee in relation to the size of the settlement, is meant to guard against a "windfall."[4]  *In re Gilat Satellite Networks, Ltd.*, No. CV-02-1510 (CPS)(SMG), 2007 U.S. Dist. LEXIS 68964, at *52 (E.D.N.Y. Sept. 18, 2007).  Courts in the Second Circuit routinely award one-quarter to one-third of the fund in FLSA cases, *Asare v. Change Group New York, Inc.*, No. 12 Civ. 3371 (CM), 2013 U.S. Dist. LEXIS 165935, at *57 (S.D.N.Y. Nov. 18, 2013) (citing FLSA cases), and sometimes more, *Frank*, 228 F.R.D. at 189 (40% of the fund); *Gay*, 2014 U.S. Dist. LEXIS 232, at *35 (awarding 35.3%).  Here, the requested fee, before expenses

---

[4] Notably, however, the fee does not have to be proportional to the recovery.  *Kassim v. City of Schenectady*, 415 F.3d 246, 252 (2d Cir. 2005).

are deducted, is exactly one-third.

### f)   PUBLIC POLICY CONSIDERATIONS

The sixth factor, public policy considerations, strongly supports the fee request.  "The Second Circuit and courts in this district also have taken into account the social and economic value of class actions, and the need to encourage experienced and able counsel to undertake such litigation."  *Asare,* 2013 U.S. Dist. LEXIS 165935, at \*57 (citing *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 399 (S.D.N.Y. 1999)).

One very significant factor that favors an award in this case is that Plaintiffs' counsel spent almost $200,000 on notice and went back to the Court to obtain permission to issue additional notice to reach as many workers as possible.  Given the transient nature of the population of workers, the fact that many are young and even students, the notice process was challenging.  *See* Walsh Decl. ¶ 8 ("[M]any Ruby Tuesday "front of house" workers are very young and change addresses frequently without leaving a forwarding address.").  The perseverance and resources committed by Plaintiffs' counsel in this effort should be rewarded, and the public policy factor supports the requested fee.

### 2.   THE FEE IS ALSO REASONABLE UNDER A LODESTAR ANALYSIS

Under the lodestar analysis, the "presumptively reasonable fee" is calculated by multiplying the reasonable number of hours spent on the case by reasonable hourly rates.  *Millea v. Metro-North RR. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (internal quotation marks omitted).

### a)   THE REASONABLE HOURLY RATES

A reasonable hourly rate is one which is "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, expertise, and reputation."  *I.B. v. N.Y. City Dep't of Educ.*, 336 F.3d 79, 80 (2d Cir. 2003) (internal quotation marks omitted).

The attorney's rates are reasonable. The two lawyers who performed the most work on the case were Adam Gonnelli, a partner, at an hourly rate of $695 and Christopher Marlborough, a senior associate, at an hourly rate of $555. The hourly rates for all the lawyers and paralegals working on the case are listed in Exhibits H and I to the Gonnelli Decl.

These rates are commensurate with what other lawyers of similar experience charge, as acknowledged by courts in the Second Circuit. *See Asare*, 2013 U.S. Dist. LEXIS 165935, at *49-51 (approving $750 for partner time, $500 for senior associate time, $300 for associate time and $150 for paralegal/staff time in FLSA case and citing cases where similar rates were approved in the Southern District of New York); *Vilkhu v. City of N.Y.*, No. 06-CV-2095 (CPS) (JO), No. 06-CV-2095, 2009 U.S. Dist. LEXIS 73696, at *16 (E.D.N.Y. June 26, 2009), *vacated and remanded on other grounds*, Nos. 09-1178-cv(L), 09-3032-cv(CON), 2010 U.S. App. LEXIS 8191 (2d Cir. Apr. 21, 2010) (employment law firm based in New York charges $450 to $900 for partners and $215 to $450 for associates); *Rozell v. Ross-Hoist*, 576 F.Supp.2d 527, 546 (S.D.N.Y. 2008) ($600 for senior partner and $350 for associates in New York).

Faruqi's rates are also consistent with the market data for "Non-Insurance Litigation" attorneys compiled by TyMetrics, a leading source of attorney hourly rates. *See G.B. v. Tuxedo Union Free Sch. Dist.*, 894 F. Supp. 2d 412, 432 n.15 (S.D.N.Y. 2012) (using TyMetrics data to conclude that billing rates in New York increased 12% from 2009 to 2011). TyMetrics does not break down its report to the level of FLSA lawyers, but referring to the rates for "Non-Insurance Litigation" attorneys is instructive.

The TyMetrics data places Faruqi's rates between the 50th and 75th percentile for "Non-Insurance Litigation" for New York City. *See* TyMetrics 2013 Real Rate Report Snapshot, excerpted at Exhibit J of the Gonnelli Decl. TyMetrics reports in its chart "2012: Real Rates for

Partners and Associates Working on Non-Insurance Company Litigation by City (New York)" that the third quartile was $835 for partners and $560 for associates.  Mr. Gonnelli's current rate of $695 falls well below the 75% mark for partners.  Mr. Marlborough's rate falls below the rate of $560 for associates.   Accordingly, Faruqi's rates fall below the 75% mark.   Given the complexity of wage and hour litigation, *see Asare*, 2013 U.S. Dist. LEXIS 165935, at *54, rates in the top half of the two categories are not unreasonable.

Plaintiffs' counsel's rates have also been approved by a court in the Southern District of New York in another FLSA-only case. *See Bazzini v. Club Fit Mgmt., Inc.*, No. 1:08-cv-04530-BSJ-MHD (S.D.N.Y. Apr. 21, 2010). *See also Cox v. Clarus Marketing Group, LLC.*, 291 F.R.D. 473, 483 (S.D. Cal. 2013) (approving Faruqi & Faruqi, LLP's 2013 partner rates of $625-$850, associate rates of $390-$535 and paralegal rates of $265-$300, stating that "hourly rates charged by the attorneys appear reasonable in light of the experience of counsel and complexities of this case"); *In re Alexia Foods, Inc. Litig.*, Case No. 4:11-cv-06119 PJH, ECF No. 66 (N.D. Cal. Dec. 12, 2013) (approving Faruqi & Faruqi, LLP's 2013 hourly partner rates of $650-$875, associate rates of $390-$450); *In re Haier Freezer Consumer Litigation*, Case No. C 11-02911 EJD, ECF No. 90 (N.D. Cal. Oct. 25, 2013) (approving Faruqi & Faruqi, LLP's 2013 hourly partner rates of $645-$850, associate rates of $375-$535, paralegal rates of $250-$265); *Rossi v. Proctor & Gamble Co.*, No. 11-7238 (JLL), 2013 U.S. Dist. LEXIS 143180, at *30 (D.N.J. Oct. 3, 2013) (finding the 2013 hourly partner rates of $650-$850, associate rates of $375-$535, paralegal rates of $235-265 and time of Faruqi & Faruqi, LLP "are based on a reasonable hourly billing rate for such services given the geographical area, the nature of the services provided and the experience of the lawyer").

**b)      THE HOURS EXPENDED**

Plaintiffs' expended a total of 1,567 hours on the case for a lodestar of $866,770.75.  *See* Gonnelli Decl., Exs. H and I.  Given the number of Opt-Ins, complex off-the-clock damages estimates and the amount of discovery, the hours expended by Plaintiffs' counsel were reasonable.

**c)      ADJUSTMENTS TO THE LODESTAR**

The court then must undertake an analysis to determine if an increase or decrease in the lodestar is warranted. *Guadalupe v. Tri-State Emp't*, No. 10 CV 3840 (NG) (CLP), 2013 U.S. Dist. LEXIS 123951, at *49 (E.D.N.Y July 31, 2013); *Dunn v. Advanced Credit Recovery, Inc.*, No. 11 Civ. 4023 (PAE) (JLC), 2012 U.S. Dist. LEXIS 27205, at *15 n.6 (S.D.N.Y. Mar. 1, 2012) (*Johnson* factors should be used to adjust lodestar, if necessary).

A Second Circuit case on fee applications, *Arbor Hill Concerned Citizens Neighborhood Associations v. County of Albany*, 522 F.3d 182 (2d Cir. 2007), affirmed the use of the factors delineated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974) for use in the Second Circuit.  The *Arbor Hill* decision has engendered some controversy.  In rejecting the term "lodestar" in favor of the term "presumptively reasonable fee," the Second Circuit stated, in dicta, that the *Johnson* factors should be used to help set an appropriate hourly rate, rather than later in the process to adjust a "lodestar" figure.  *Id.* at 192.  The court also noted that some of the muddled jurisprudence had resulted in using the same factors twice, once to set an hourly rate, and then to apply an adjustment to the lodestar.  *Id*. at 190.

However, the United States Supreme Court reaffirmed the lodestar term and approach in *Perdue v. Kenny A*, 559 U.S. 542 (2010).  Many courts in the Second Circuit continue to use the lodestar term and method. [5]

The twelve factors in the oft-cited *Johnson* case are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limit imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

An analysis of these factors supports plaintiffs' counsel's fee application.

### (i)       THE TIME AND LABOR REQUIRED

Plaintiffs' counsel expended 1,567 hours for a presumptively reasonable fee of $866,770.75.  Plaintiffs' counsel is only requesting a small multiplier of this amount.

### (ii)      THE NOVELTY AND DIFFICULTY OF THE QUESTIONS

The legal questions in this case were complex, but not particularly novel.  In any case, Plaintiffs' counsel is familiar with the law and issues in complex wage and hour maters, so this factor is addressed in counsel's hourly rates.

---

[5] It is apparently an open question whether the *Johnson* factors should be used in determining an appropriate hourly rate, to adjust the lodestar after it has been calculated, or a mix of both.  *See Saunders v. City of N.Y.*, No. 07 civ 830, 2009 U.S. Dist. LEXIS 115366, at *23 (S.D.N.Y. Dec. 9, 2009) ("What this means in practice is unclear . . . .").  However, courts agree that "double counting" is inappropriate; that is, the same factor should not be used in establishing an hourly rate and then also to adjust the lodestar.  Plaintiffs' counsel has attempted to resolve this issue by noting where certain *Johnson* factors have been absorbed into the hourly rate, and where they have not.

### (iii)   THE LEVEL OF SKILL REQUIRED TO PERFORM THE LEGAL SERVICE PROPERLY

Cases of this nature, and indeed, complex litigation generally, requires a high level of skill to perform. *See Allapattah Servs. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1208 (S.D. Fla. 2006) (level of skill factor includes preparation, efficiency, advocacy and knowledge of substantive law). However, Plaintiffs' counsel is very experienced in complex litigation and wage hour cases (*see* Faruqi & Faruqi, LLP firm resume attached as Exhibit F to the Gonnelli Affidavit), and that skill and experience is adequately reflected in the firm's hourly rates.

### (iv)   THE PRECLUSION OF EMPLOYMENT BY THE ATTORNEY DUE TO ACCEPTANCE OF THE CASE

Obviously any time a lawyer takes a case on which he or she spends any time, the lawyer is somewhat precluded from taking on other matters. However, Plaintiffs' counsel's practice is entirely contingent, so it is impossible to say that Plaintiffs' counsel declined certain payment in another case by taking this one.

### (v)   THE ATTORNEYS' CUSTOMARY HOURLY RATE

Plaintiffs' counsel's customary hourly rates are set for in the Gonnelli Decl. at Exhibits H and I and reflected in the lodestar.

### (vi)   WHETHER THE FEE IS FIXED OR CONTINGENT

The fee in this case is entirely contingent. This fact alone militates in favor of an increase in the lodestar to compensate counsel for the risk and delayed payment in contingency litigation. *Johnson v. Ga. Highway*, 488 F.2d 714. Although Plaintiffs' counsel at all times believed in the strength of the case, recovery is never a certainty. *See In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 467 (S.D.N.Y. 2004) (contingent nature of litigation is key factor in determining reasonable attorneys' fees).

One factor that should be noted is that the expenses in the case, which counsel advanced, were very high for the size of the case. Most of the expenses were incurred in attempting to notify as many class members as possible. Plaintiffs' counsel incurred almost $200,000 in notice costs alone. Gonnelli Decl., Exhibit K.

The fact that the fee is entirely contingent and counsel stands to lose its considerable financial investment in the case strongly supports the fee request.

### (vii)    THE TIME LIMITATIONS IMPOSED BY THE CLIENT OR THE CIRCUMSTANCES

There were no particular time limits involved in this case that are not present in most complex litigation.

### (viii)    THE AMOUNT INVOLVED IN THE CASE AND THE RESULTS OBTAINED

Many courts consider this factor to be the most important one, and it is the one that most strongly supports the fee application. The Second Circuit and the U.S. Supreme Court have stressed the "degree of success" factor in determining a reasonable fee. *Kassim*, 415 F.3d at 255-56 (quoting *Hensley v. Eckkerhart*, 461 U.S. 424, 436 (1983)). The settlement of $1,675,000 for the Opt-Ins represents a significant achievement in this case, 90% of the midpoint of Plaintiffs' counsel's actual damages figure.

Accordingly, the results obtained strongly support the fee award.

### (ix)    THE EXPERIENCE, REPUTATION AND ABILITY OF THE ATTORNEYS

Plaintiffs' counsel enjoys a good reputation in the bar, and is experienced and skilled in complex litigation and wage hour cases. *See* firm resume of Faruqi & Faruqi, LLP attached as Exhibit F to the Gonnelli Declaration. However, these factors are adequately reflected in the firm's hourly rates.

### (x)  THE UNDESIRABILITY OF THE CASE

The undesirability factor includes the difficulty and complexity of the case.  *See Orme v. Burlington Coat Factory of Or., LLC,* 2010 U.S. Dist. LEXIS 43258,  at *24 (D. Or. May 3, 2010) (finding that this factor favored fee application and noting "employment cases are undesirable to the bar due to their factual and legal complexity."); *Smith v. Voorhees College*, No. 5:05-1911, 2008 U.S. Dist. LEXIS 50003, at *13-14 (D.S.C. June 27, 2008) ("Many attorneys consider employment cases to be undesirable due to the fact that they require special expertise and have many risks.").

A more significant factor is the expenses advanced by Plaintiffs' counsel in comparison to the requested fee.  Any large FLSA case will generate significant notice costs and this case was no exception.  The initial mailed notice to 82,388 workers, the reminder notice, and a separate supplemental mailing to workers whose addresses were invalid cost a total of $197,264.04.  Incurring total costs of $235,267.46 and risking that outlay for a return of a slight multiplier of lodestar is not a desirable circumstance.

Although this scenario is not unusual, with the benefit of hindsight and taking into account the risk of contingency litigation, this case would not be considered especially desirable.  Thus, this factor militates in favor of the fee request.

### (xi)  THE NATURE AND LENGTH OF THE PROFESSIONAL RELATIONSHIP WITH THE CLIENTS

Plaintiffs' counsel had never represented any of the clients before, so this factor lends some support to the fee request.

### (xii)  AWARDS IN SIMILAR CASES

Like the civil rights statutes, there is not necessarily a relationship between the recovery and the fee. That is, it is possible that attorneys could spend thousands of hours and millions of

dollars in fees on a $50,000 recovery if it enforces the civil rights or employment statutes. *See, e.g., Kassim*, 415 F.3d at 252. That said, the fees requested here would be roughly one-third of the recovery, well within the normal range for contingent litigation. *Klein ex rel. Ira v. PDG Remediation, Inc.*, No. 95 Civ. 4954, 1999 U.S. Dist. LEXIS 650, at *11 (S.D.N.Y. Jan. 28, 1999) (one-third recovery within range of reasonableness for Second Circuit). "Courts regularly award lodestar multipliers from two to six times lodestar." *Johnson*, 2011 U.S. Dist. LEXIS 105775, at *58 (awarding fee in wage and hour case and collecting cases). This factor supports the fee request.

### C.  PLAINTIFFS' COUNSELS' EXPENSES IN THIS CASE SHOULD BE REIMBURSED

Expenses are also available under the FLSA, 29 U.S.C. 216(b).  *See also LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir. 1998) (abuse of discretion not to award reasonable out of pocket expenses).  In this case, Plaintiffs' counsel's expenses were high given the size of the case.   In total, Plaintiffs' counsel incurred $235,267.46 and anticipates up to $56,268.00 more.  The bulk of the expenses were notice to the class ($197,264.04); deposition costs ($11,450.59); mediation fees ($14,242.07); and anticipated settlement claims administration ($56,268.00).  In addition, Plaintiffs' counsel is only seeking reimbursement of $275,000, less than the maximum estimate.  *See* Gonnelli Decl., Ex. K.  All of these expenses were necessary to the litigation and should be reimbursed.

### D.  THE PROPOSED PLAN OF ALLOCATION SHOULD BE APPROVED

The proposed distribution has factored in the time worked by each Opt-In as well as the differences in each state's tip-credit minimum wage and statute of limitations.  Given that there are no records to support estimates of off-the-clock work, this process has yielded a fair

distribution.  In addition, each of the 4170 Opt-Ins was given an estimated amount of their award and not a single one has rejected it.

Plaintiffs' counsel also set a minimum award of $25.  If an employee demonstrates enough interest in the case to opt in, he or she should receive more than a de minimum payment. *Henry*, 2014 U.S. Dist. LEXIS 72574, at *9 (approving $100 minimum payment). For that reason, Plaintiffs' counsel decided to set the minimum payment.

Since the process to determine awards and the minimum payments are both reasonable under the circumstances of this case, the plan of allocation should be approved.

### E.    SERVICE AWARDS ARE APPROPRIATE IN THIS CASE

Plaintiffs' counsel requests that this Court grant service awards to seven plaintiffs who took leadership roles in the litigation and contributed to the success of the case as a whole.  This Court has noted that "[s]ervice awards fulfill the important purpose of compensating plaintiffs for the time they spend and the risks they take.  *Flores*, 2014 U.S. Dist. LEXIS 11026, at *27 (citing *Massiah*, 2012 U.S. Dist. LEXIS 166383, at *8).  One court has noted that service awards are especially important in employment cases, where employees (especially current ones) have assumed risks of retaliation or losing future employment opportunities: "[I]n employment litigation, the plaintiff is often a former or current employee of the defendant and thus, by lending his name to the litigation, he has, for the benefit of the class as a whole, undertaken the risk of adverse actions by the employer or co-workers."  *Velez v. Majik Cleaning Servs., Inc.*, No. 03 civ 8698, 2007 U.S. Dist. LEXIS 46223, at *23 (S.D.N.Y. June 22, 2007) (emphasis omitted) (internal quotation marks omitted). "Here, Class Representatives faced the risks that new employers would learn that they were class representatives in a lawsuit against their former employer and take adverse action against them.  Moreover, each time they change jobs, they will risk retaliation in the hiring process." *Asare*, 2013 U.S. Dist. LEXIS 165935, at *40.

The plaintiffs requesting service awards have done far more than "lend their name to the litigation."  In evaluating an application for a service award, courts consider: the time and effort expended on the litigation; burdens sustained by the plaintiffs, including personal risk; and the ultimate recovery.  *Asare*, 2013 U.S. Dist. LEXIS 165935, at *38.  "Courts also recognize the important factual knowledge that class representatives bring to employment class actions….." *Id*.

Plaintiffs' counsel recommends the following plaintiffs for service awards:

**Michael Guttentag**

Mr. Guttentag is one of the named plaintiffs in the case and was the first to seek counsel. Mr. Guttentag helped with the complaint, produced discovery, responded to interrogatories, sat for a deposition and submitted a declaration in support of conditional certification.  He also attended a mediation and met in person frequently with Plaintiffs' counsel.  *See* Declaration of Michael Guttentag, submitted herewith as Exhibit L.

**Steven Reeves**

Mr. Reeves, like Mr. Guttentag, worked tirelessly and attentively on the case.  He helped counsel understand the practices at various Ruby Tuesday restaurants and helped place their conduct in the context of the restaurant industry.  Mr. Reeves helped with the complaint, produced discovery, responded to interrogatories, sat for a deposition and submitted a declaration in support of conditional certification.  He also spoke to the mediator about his experiences.  Mr. Reeves also attended the depositions of Ruby Tuesday witnesses to help counsel understand their testimony and helped counsel understand the document production.  He was also in frequent contact with Plaintiffs' counsel by phone and email with ideas about this litigation.  *See* Declaration of Steven Reeves, submitted as Exhibit M to the Gonnelli Decl.

It should be noted that Mr. Guttentag and Mr. Reeves, as the most visible participants in the suit, took the greatest reputational risk.  *Asare*, 2013 U.S. Dist. LEXIS 165935, at *39 ("Even where there is no record of retaliation, class representatives merit recognition for assuming such risk.").  In addition, in their capacity as named plaintiffs, Mr. Reeves and Mr. Guttentag were contacted frequently by class members for information, praise and criticism.  This work, like all the work in the case, took time and dedication and should be compensated.

Plaintiffs' counsel recommends an award of $14,500 each to Mr. Guttentag and Mr. Reeves.

**Shannon Clary**

Shannon Clary opted in to the case on June 11, 2012.  Ms. Clary provided testimony, sat for a deposition, and provided a declaration in support of the conditional certification motion.

**Sera Ciufalo**

Sera Ciufalo opted in to the case on June 12, 2012.  Ms. Ciufalo provided testimony, sat for a deposition, and provided a declaration in support of the conditional certification motion.

**Ryan Friedman**

Ryan Friedman opted in to the case on June 11, 2012.  Mr. Friedman provided testimony, sat for a deposition, and provided a declaration in support of the conditional certification motion.

**Mark Porter**

Mark Porter opted in to the case on August 7, 2012.  Mr. Porter provided testimony, sat for a deposition, and provided a declaration in support of the conditional certification motion.

Plaintiffs' counsel recommends a service award of $5,000 each for Ms. Clary, Ms. Ciufalo, Mr. Friedman, and Mr. Porter.

**Benjamin Kimball**

Benjamin Kimball opted in to the case on May 31, 2013. Mr. Kimball provided a declaration that would have been used in future proceedings, but ultimately was not needed. Plaintiffs' counsel recommends a service award of $1000 for Mr. Kimball.

The service awards total $50,000, or approximately 3% of the settlement amount. This is commensurate with in other cases. *See, e.g., Gilliam v. Addicts Rehab. Cent. Fund*, No. 05 Civ. 3452, 2008 U.S. Dist. LEXIS 23016, at *8 (S.D.N.Y. Mar. 24, 2008) (awarding 3.3% of $450,000 settlement in incentive awards); *RMED Int'l, Inc. v. Sloan's Supermarkets*, No. 94 Civ. 5587, 2003 U.S. Dist. LEXIS 8239, at *7 (S.D.N.Y. May 15, 2003) (2.6% of $975,000).

Accordingly, the service fees are reasonable and should be approved. *See Henry v. Little Mint, Inc.*, No. 12 Civ. 3996 (CM), 2014 U.S. Dist. LEXIS 72574 at *10 (S.D.N.Y. May 23, 2014) (calling $10,000 service award "modest" and collecting cases). *Sewell v. Bovis Lend Lease LMB, Inc.*, No. 09 Civ. 6548 (RLE), 2012 U.S. Dist. LEXIS 53556, at *40 (awarding $10,000 and $15,000 service awards in FLSA case).

## IV.    CONCLUSION

For the forgoing reasons, the settlement, the plan of allocation, and the requests for attorneys' fees, expenses, and service awards should be approved.

Dated:  September 15, 2014                    Respectfully submitted,

                                             **FARUQI & FARUQI, LLP**

                                             */s/ Adam Gonnelli*

                                             Lubna Faruqi (LF-8409)
                                             Adam R. Gonnelli (AG-4782)
                                             369 Lexington Avenue, 10th Floor
                                             New York, NY 10017
                                             Telephone: (212) 983-9330
                                             Facsimile: (212) 983-9331

Steven S. Siegel
**THE LAW OFFICE OF STEVEN S. SIEGEL,
P.L.L.C.**
401 Franklin Avenue, Suite 300
Garden City, NY 11530
Tel:  (516) 665-2800

*Attorneys for Plaintiffs*